# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| JEANETTE VOUGHT, MARK SKUTACK, DANEEN SKUTACK, and ROGER E. FROCK, on behalf of themselves and a class of all other persons similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 10-CV-2052 |
| v. | ) ) | |
| BANK OF AMERICA, N.A., and BAC HOME LOANS SERVICING, LP, | ) ) ) | |
| Defendants. | ) | |

## OPINION

Judge Posner recently wrote for the Seventh Circuit:

> It is a curiosity of class action litigation that often there is greater ferocity in combat among the class lawyers over the allocation of attorneys' fees than there is between the class lawyers and the defendants. The contest among the lawyers is a zero-sum game. But the contest between them and the defendants is a positive-sum game because the class lawyers are naturally very interested in the fee component of any settlement, while the defendants care only about the size of the settlement, including fees. So the lawyers *may* be willing to settle for less for the class if the defendants will help them obtain a generous fee award, and the defendants *will* be happy to help them if the sum of the fee award and the relief granted to the class is smaller than it would be if the class lawyers pressed for more generous relief for the class.

*In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 742-43 (7th Cir. 2011) (emphasis in

original). In the present case, Defendant Bank of America NA (BANA) took over the servicing

of mortgages for approximately 14,000 homeowners from Taylor, Bean & Whitaker (TBW), a

company that (as it later came to light) had been engaging in all manner of financial shenanigans.

In doing so, BANA and Ginnie Mae promised that if the homeowners made mortgage payments

to TBW during the transition, BANA would credit their accounts. This seems generous, but it is

also fair because BANA didn't give the homeowners any notice of the transition until well after the homeowners were supposed to stop paying TBW.

But then TBW filed for bankruptcy and BANA alleges that the FDIC seized the lockbox bank that held borrower's payments, so many of the mortgage payments were either frozen or disappeared into TBW.[1] BANA, being a large financial institution, did not seem to get a handle on this as quickly as it should have. Instead, the bank started sending threatening letters and charging late fees, accusing the homeowners of not paying their mortgages when they had in fact done so—although, regrettably and understandably, many of those payments had been sent to TBW. BANA says they blocked credit reporting, but one person said that after he got divorced, his ex-wife could not refinance their house because her credit score dropped as a result of the missing payment. (BANA says this is very unlikely.) Another person said that it took him daily calls and letters to various government officials over many months before BANA finally realized what was going on and fixed his account. Right now, there are still some accounts that have not been credited.

A number of the homeowners individually filed lawsuits against BANA, trying to hold them accountable for the missing payments. Those cases were combined into the class action here. Over the past two and a half years, this case has been litigated heavily. Several months ago, class counsel and defendant's counsel presented this court with a settlement agreement. In general terms, BANA promised to: credit all the homeowners' accounts for the full amount of their missing payments; waive or refund late fees; issue an IRS Form 1098 so the homeowners could take the extra interest deduction that they weren't able to earlier; and set up a telephone

---

[1] A "lockbox" is "a facility offered by a financial institution for quickly collecting and consolidating checks and other funds from a party's customers." Lockbox, BLACK'S LAW DICTIONARY (9th ed. 2009). A bank offering lockbox services allows payments from multiple individuals to be directed to a single location, whereupon it processes and consolidates those payments for a commercial customer.

hotline to provide informational assistance. Of course, BANA has proclaimed mightily that it never had those payments to begin with, so it would be crediting those accounts about $7.5 to $15 million out of its own pocket. But it should have known or discovered a certain amount of risk when it performed their due diligence on TBW before they took over the servicing the mortgages, and after all, the mortgage business is still relatively decent money. And furthermore, who's to say that BANA won't eventually get paid, at least in part, from the bankruptcy estate? On top of crediting the accounts, BANA would also provide monetary relief in the form of: $25 if a class member provided their tax filings showing that they could have but were unable to deduct mortgage interest; $50, up to a total of $500,000 if their account had not been credited by December 1, 2011, and they made a written request to BANA about it; and $75 if they could prove that their credit was adversely affected. By the deadline, the claimants had submitted claims totaling only $38,600.

In return, the settlement releases BANA from all liability. Furthermore, BANA will pay class counsel's fees of $2 million. Now, far be it for this court to delve too deeply into the horse-trading that went on between the parties during the settlement negotiations, but the facts here sound a lot like a case in which the Seventh Circuit chastised the district court for having "sold the claimants down the river". Certainly it is not as bad as what happened in a case where the class members had to pay class counsel's legal fees, *Kamilewicz v. Bank of Boston Corp.*, 100 F.3d 1348 (7th Cir. 1996). But for a settlement where BANA is required to do what it should have done two years ago (and which, incidentally, it has already started to do, whether out of the goodness of its heart or not)—and to compensate class members for two years' trouble just $38,000 and class counsel $2,000,000 is not something that would strike a jury in downstate Illinois as a particularly good bargain. This isn't to say that anyone thinks that BANA *set out* to

hoodwink the homeowners. But as one class member said while opting out of the settlement: "If we thought for one split second that $150 would get noticed by the huge conglomerate known as Bank of America, it might be worth it, but you know about a snowball's chance in hell."

This case is before the court for ruling on the Motion for Final Approval of Settlement (#99) filed by the BANA and BAC Home Loans Servicing, LP, (BAC)[2] and the Motion for Final Approval of Settlement (#101) filed by Plaintiffs Jeanette Vought ("Vought"), Mark and Daneen Skutack ("Skutack"), and Roger E. Frock ("Frock"), on behalf of themselves and a class of all other persons similarly situated. On January 30, 2012, this court entered a Preliminary Approval Order (#86) certifying classes and preliminarily approving the settlement agreements. On May 31, 2012, this court held a final fairness hearing. This court has carefully reviewed the arguments of the parties and the documents filed by the parties. Following this careful and thorough review, Plaintiffs' and Defendant's Motions for Final Approval of Settlement (#99; #101) are DENIED. Further, this case is referred to Judge David G. Bernthal for further mediation.

## JURISDICTION

This court has jurisdiction pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act (CAFA). The case was commenced on March 5, 2010, after CAFA's effective date of February 18, 2005. CAFA requires, with certain exceptions not relevant here, minimal diversity, an amount in controversy exceeding $5,000,000, and at least 100 proposed plaintiff class members. 28 U.S.C. §§ 1332(d)(2), (d)(5); *Hart v. FedEx Ground Package Sys. Inc.*, 457 F.3d 675, 679 (7th Cir. 2006). Plaintiff Jeanette Vought is a citizen of Illinois (Second Amended Complaint,

---

[2] BAC Home Loans Servicing merged into Bank of America, N.A., and Bank of America, N.A. is the surviving entity. Therefore, for purposes of this opinion, this court will simply refer to BAC Home Loans Servicing or Bank of America, N.A. as "Defendant."

#63 ¶ 28). Plaintiff Frock is a citizen of Ohio (#63 ¶ 29). Plaintiffs Mark and Daneen Skutack are

citizens of Pennsylvania. (#63 ¶¶ 30-31). Defendant BANA maintains its headquarters and

principal place of business in North Carolina (#63 ¶ 32). Plaintiffs have alleged that the amount

in controversy exceeds $5,000,000 (#63 ¶ 24). Plaintiffs have further alleged that thousands of

individuals are similarly situated with regard to their putative cause of action (#63 ¶¶ 10, 38-39).[3]


## FACTUAL AND PROCEDURAL HISTORY

### I. Background facts

Plaintiffs Vought, Skutack, and Frock, as well as all members of the Class and Subclass,

each had home mortgages that were serviced by TBW until approximately August 2009.[4] In

August 2009, as a result of TBW's default and impending bankruptcy, Ginnie Mae, the

government guarantor for residential mortgage-backed securities, assigned the sub-servicing

portions of the TBW portfolio to BANA. Ginnie Mae made this assignment pursuant to a

servicing contract entered into with BANA in March 2009. This agreement, in general terms,

required BANA to service Ginnie Mae loans on an as-needed basis. TBW was instructed to stop

processing mortgage payments effective August 6, 2009. BANA (then BAC) sent a notice to

Plaintiffs dated August 23, 2009, indicating that TBW's right to collect payments and service the

mortgage was being transferred to BAC effective September 1, 2009. Further, this notice

indicated that the date that TBW would stop accepting payments was August 5, 2009, and that

---

[3] Although Plaintiffs neglected to explicitly allege the existence of over 100 putative class members in the Second Amended Complaint, the complaint does allege "thousands of TBW mortgagors… in the same situation as Plaintiffs all had problems with the transfer." (#63 ¶ 10). Further, this class of objection, not asserted here, is procedural and not jurisdictional. *See Law Offices of K.C. Okoli, P.C. v. BNB Bank, N.A.*, 11-904, 2012 WL 1605829 (2d Cir. May 9, 2012).

[4] This opinion refers to all named Plaintiffs, class members, and subclass members, as "Plaintiffs." The Class consists of similarly-situated individuals who have not had their payment or payments credited and late fees refunded, and the Subclass consists of individuals who have had the credit and refund applied. These terms are defined in more detail *infra*.

BAC would begin accepting payments on August 6, 2009. However, TBW continued processing

mortgage payments for approximately two weeks after the August 6, 2009 deadline.

On August 24, 2009, TBW filed for bankruptcy. When the FDIC seized the lockbox bank

controlled by TBW (Colonial Bank), Plaintiffs' mortgage payments were frozen. BANA's

counsel explained that as of the time of the final fairness hearing, the reconciliation process had

not yet been fully resolved despite the passage of over two years. Thus, while BANA had not

received those funds, they still hoped to in the future.

During this period, BANA assured Plaintiffs that during the transition, if TBW received a

payment in a timely fashion instead of BANA, no late fee or adverse credit reporting would be

imposed. For instance, on BANA's website, a newswire was published on August 27, 2009,

indicating, in pertinent part:

> Bank of America assures homeowners that during this transition if TBW, rather than
> BAC Home Loans Servicing, receives a payment in a timely fashion, no late fee or
> derogatory credit reporting will be imposed with respect to that payment and the payment
> will not be treated as late for any other purpose. This protection will remain in place
> through the October payment period.[5]

This language was echoed by Ginnie Mae, which issued a statement indicating, in pertinent part:

> *My loan was transferred [from TBW]. I made a loan payment on time, but to the
> old servicer. Can I be charged a late fee? Will my credit be affected?*
>
> No. Bank of America will work with borrowers and will not charge late payment
> fees or report late payments to the credit bureaus through the October 2009
> payment period.[6]

Despite both of these notices, BANA failed to properly credit Plaintiffs' home mortgage

accounts for timely payments made to TBW ("uncredited payments", termed "missing

---

[5] Bank of America Set to Begin Welcoming Former Taylor, Bean, Whitaker Customers
Transfer of Servicing of Ginnie Mae-Securitized Loans from TBW to BAC Home Loans Servicing
Completed, *available at*
http://mediaroom.bankofamerica.com/phoenix.zhtml?c=234503&p=RssLanding&cat=news&id=1390270
[6] Help For Consumers with Taylor, Bean, & Whitaker Loans, August 31, 2009, *available at*
http://www.ginniemae.gov/media/tbw_consumer_grid.pdf.

payments" in the Settlement Agreement at § 1.21). The vast majority of these uncredited payments had in fact been made by Plaintiffs for their August 2009 mortgage payments.

The failure to properly credit Plaintiffs' home mortgage accounts resulted in many adverse effects. Plaintiffs were assessed late fees on their uncredited payments. Plaintiffs allegedly suffered adverse credit impact after BANA reported the uncredited payments to credit reporting agencies. Also, because Plaintiffs were not treated as having made the uncredited payments by BANA in 2009, all Plaintiffs received mortgage interest statements that underreported the amount of interest paid in 2009 by Plaintiffs. Finally, some Plaintiffs made written requests to BANA to properly credit their accounts for their uncredited payments, to little avail. BANA, in its Motion for Approval, indicated that it had attempted to block credit reporting for all delinquent accounts. However, due to certain oversights during processing, BANA also admits that this block was not applied equally to all accounts. Although this court is aware of the general nature of these issues, the parties have not provided an exact accounting of the number or percentage of Plaintiffs who were affected by each of these adverse effects, or the degree to which the credit block was not universally applied.

## II. Initiation of suit and preliminary dispositive motions

On March 5, 2010, Plaintiffs Wayne Vought (now deceased) and Jeanette Vought filed a class action complaint in this court (#1). On April 2, 2010, Plaintiff Roger E. Frock filed a class action complaint in the United States District Court in the Southern District of Ohio. On May 18, 2010, Plaintiffs Mark Skutack and Daneen Skutack filed a class action complaint in the United States District Court in the Eastern District of Pennsylvania. On July 8, 2010, these three separate actions were consolidated in the present case (#28).

On May 10, 2010, Defendant filed a Motion to Dismiss, seeking to dismiss the complaint filed by Wayne and Jeanette Vought (#11). On July 15, 2010, Magistrate Judge David G. Bernthal issued a Report and Recommendation recommending that Defendant's Motion to Dismiss be denied (#29). On July 20, 2010, Wayne and Jeanette Vought, Mark and Daneen Skutack, and Roger E. Frock filed their First Amended Consolidated Complaint (#30). As a result of the filing of the First Amended Consolidated Complaint, this court entered an order on August 5, 2010, finding that the Defendant's Motion to Dismiss (#11) and the Report and Recommendation (#29) were moot.

On August 19, 2010, Defendant filed a Motion to Dismiss (#37) seeking to dismiss the First Amended Consolidated Complaint (#30). On September 24, 2010, Judge Bernthal issued a Report and Recommendation (#50) recommending that Defendant's Motion to Dismiss (#37) be denied. On October 27, 2010, this court accepted the Report and Recommendation (#50) and denied Defendant's Motion to Dismiss (#37). On January 5, 2011, Plaintiffs filed their Second Amended Consolidated Complaint (#63). This Second Amended Consolidated Complaint (#63), which is the operative complaint here, contained the following five claims alleged by Plaintiffs: (1) breach of contract; (2) breach of contract, based on the theory that Plaintiffs were intended third-party beneficiaries; (3) unjust enrichment; (4) requests for injunctive relief; (5) violation of the Real Estate Settlement Procedures Act (RESPA). In addition, on behalf of class members who have homes in Illinois, Plaintiffs alleged a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act.

On January 24, 2011, Defendant filed a Motion to Dismiss (#66), seeking to dismiss the third party beneficiary breach of contract claim contained in Plaintiffs' Second Amended Consolidated Complaint (#63). On April 7, 2011, Judge Bernthal issued a Report and

Recommendation (#73) recommending that Defendant's Motion to Dismiss (#66) be granted. On April 29, 2011, the parties filed a Joint Motion to Stay (#81) in order to conduct settlement negotiations. On May 3, 2011, this court granted the parties' Motion to Stay (#81).

## III. Discovery

The parties have represented to this court that there was extensive discovery completed in this case. Specifically, Plaintiffs aver that they propounded discovery on Defendant in the form of Requests for Production of Documents and Interrogatories. Defendant also propounded similar discovery on the named Plaintiffs. The parties were unable to resolve certain discovery disputes without seeking the assistance of this court. Thus, on September 15, 2010, and April 13, 2011, Plaintiffs filed two Motions to Compel Discovery Responses (#44; #74). The parties were able to negotiate a Protective Order (#49) that resolved the initial Motion to Compel Discovery Responses (#44). The second Motion to Compel Discovery Responses (#74) was withdrawn by Plaintiffs. Although this court has not viewed the discovery in this case, the parties represent to this court that "Defendant[] produced over 230,000 pages of documents which were indexed, reviewed, individually coded and data-based by Class Counsel." (#103 p.11).

## IV. Terms of the proposed settlement agreement

*Negotiations and mediation*

Plaintiffs and Defendant participated in two separate day-long mediation sessions. The first session was held on July 19, 2011, before Richard P. Sher. The parties indicate that although progress was made during this initial mediation, the process was ultimately unsuccessful. After the parties remained in contact after the first failed mediation attempt, they agreed to participate

in a second mediation on October 6, 2011, with Judge Donald P. O'Connell (Ret.).[7] Prior to this
second mediation, both parties submitted written materials to Judge O'Connell, outlining the
strengths and weaknesses of each party's positions in this case. During this second mediation, the
parties reached the settlement that is currently before this court for approval (henceforth
"Agreement" or "Settlement Agreement"). Judge O'Connell, in a declaration submitted to this
court on May 23, 2012, explained that: (1) the parties engaged in good faith negotiations over the
merits of Plaintiffs' claims; (2) the negotiations were long and difficult; and (3) the matter of
attorneys' fees was not discussed until the underlying disputes regarding the merits of the case
had been fully agreed upon (#104). There were scant details about how long the negotiations
lasted and the compromise process.

*Affected individuals*

The agreed settlement consists of two classes, defined as follows:

*1.36 Settlement Class* (henceforth "Class): All individuals who have, or did have, a
residential mortgage loan for real property situated in the United States of America
whose mortgage account, previously serviced by Taylor, Bean and Whitaker, was
assigned or transferred to BAC Home Loans Servicing, L.P., pursuant to a U.S.
Department of Housing and Urban Development Government National Mortgage
Association Single Family Master Subservicer agreement, in August 2009, where the
mortgage payment(s) were: (a) paid to and received by Taylor, Bean and Whitaker; (b)
on or about August 1, 2009; (c) in an amount equal to or greater than the minimum
monthly contractual amount for the month; and (d) were not credited by Defendant in
2009.

*1.39 Settlement Sub-Class* (henceforth "Subclass"): All individuals who have, or did

---

[7] Judge O'Connell served as a judge for the Circuit Court of Cook County from 1978 until 2001.  A mere
two days in mediation across two different mediators, in combination with the fact-sparse declaration by
Judge O'Connell, was an issue of concern (Tr. 11-14). However, two days in mediation has been
acceptable in a number of other cases where settlement agreements were approved. *See, e.g.*, *Chakejian v.
Equifax Info. Services, LLC*, 275 F.R.D. 201, 205 (E.D. Pa. 2011); *Cohorst v. BRE Properties, Inc.*, 3:10-
CV-2666-JM-BGS, 2011 WL 3489781 (S.D. Cal. July 19, 2011) *report and recommendation adopted,*
10CV2666 JM BGS, 2011 WL 3475274 (S.D. Cal. Aug. 5, 2011); *Serrano v. Sterling Testing Sys., Inc.*,
711 F. Supp. 2d 402, 421 (E.D. Pa. 2010); *McMahon v. Olivier Cheng Catering & Events, LLC*, 08 CIV.
8713 (PGG), 2010 WL 2399328 (S.D.N.Y. Mar. 3, 2010); *In re Gilat Satellite Networks, Ltd.*, CV-02-
1510 CPS SMG, 2007 WL 2743675 (E.D.N.Y. Sept. 18, 2007);

have, a residential mortgage loan for real property situated in the United States of America whose mortgage account, previously serviced by Taylor, Bean and Whitaker, was assigned or transferred to BAC Home Loans Servicing, L.P., pursuant to a U.S. Department of Housing and Urban Development Government National Mortgage Association Single Family Master Subservicer agreement in August 2009, where the mortgage payment(s) were: (a) paid to and received by Taylor, Bean and Whitaker; (b) on or about August 1, 2009; (c) in an amount equal to or greater than the minimum monthly contractual amount for the month; and (d) were not credited by Defendant in 2009, but were subsequently credited with payments.

(#85 exh. 1). The only qualitative distinction between the Class and Subclass is that members of the Subclass were "subsequently credited with payments" whereas members of the Class have not yet been credited.

*Equitable relief*

The settlement provides for equitable relief to all Class Members and, additionally, up to three types of monetary relief for each Class Member provided they individually comply with certain qualifying conditions and follow administrative filing procedures. Regarding the equitable relief, all Class Members who were not properly credited with missing payments will: (1) have those missing payments credited; (2) have any associated late fees reversed, or, if the late fees had already been paid, receive a refund for any paid late fees; (3) receive an IRS Form 1098 for the tax year 2011 issued by Defendant reflecting the interest portion of the missed payments; and (4) receive credit correction services provided by Defendant (#85, Agreement § 3.01.) Regarding the credit correction services, Defendant is specifically required to: (1) issue an informational job aid to assist customer service staff in responding to inquiries regarding missed payment issues; (2) provide a letter to each class member describing in neutral terms the missing payment issue and the crediting of the account; (3) provide credit information regarding class member's accounts to credit reporting bureaus, subject to confirmation that the reporting will contain no negative information regarding the missing payments; and (4) identify one central

toll-free number to be utilized in all notices and by class members for communications with

regard to any missing payment issues (#85, Agreement § 3.01(d).)

*Monetary relief*

In addition, up to three forms of monetary relief are available as part of this proposed

settlement to Class Members who submit a claim form. Plaintiffs who qualify for all three types

of relief and submit a verified claim form are entitled to recover up to $150.00 as follows:

(1) Fifty Dollars ($50.00) to class members who submit a claim form reflecting: (a) that the class member paid TBW a payment greater than or equal to a fully contractual monthly mortgage on or after August 1, 2009; (b) that their mortgage account was not credited by Defendants in 2009; (c) that they made a written request to Defendants to credit their accounts for the missing payment; and (d) that as of December 1, 2011, the missing payment had not been credited by Defendants. Claims made pursuant to this subsection of the settlement are limited to a total payment by Defendants of $500,000. If more than 10,000 class members claim relief under this subsection, the payment to each class member would be reduced proportionately. If less than $500,000 is claimed by class members, the surplus amount is retained by Defendants.

(2) Seventy-five Dollars ($75.00) to class members who submit a claim form identifying circumstances under which Defendants' credit reporting as to the missed payment resulted in an adverse effect on class members' ability to obtain, extend or continue credit. Class members must identify the lender and type of loan or credit vehicle involved.

(3) Twenty-five Dollars ($25.00) to class members who submit a claim form and attach a copy of their 2009 Schedule A to IRS Form 1040 reflecting that they itemized deductions in 2009.

(#85, Agreement § 1.06). Both Plaintiffs and Defendant represent that the only difference in

relief to which Class and Subclass Members are entitled is the payment of $50 available to Class

Members who made a written request to BANA for crediting of the missing payment, and who,

as of December 1, 2011, had not had their account credit (#116, p.4; #117, p.3).

Regarding the relief that Class Members who request exclusion from the settlement

agreement shall receive, Defendants have assured this court that

Class Members who opt out are not entitled (1) to make claims for payment and

(2) to receive the letter describing the missing payment issue and the crediting of accounts. Class Members who opt out have or will have (1) their accounts credited with any missing payment and late fees charged and be issued an Internal Revenue Service Form 1098 for the tax year in which the missing payment was credited, and (2) updated credit information reported by BANA.

(#116, p.1) This statement was repeated in substantially similar form by Plaintiffs (#117, p.2).

*Attorneys' fees*

The proposed settlement provides that Class Counsel will receive $2,000,000.00 in attorneys' fees and expenses if approved (Settlement, § 3.07). This agreed amount of attorneys' fees and expenses does not diminish the amount received by class members, as it is independent from the equitable and monetary relief. Section 2.26 of the Agreement also includes a clear sailing clause, wherein

Defendant agrees not to oppose such application or to take any position adverse to such application and further agrees to pay the amount awarded by the Court up to the agreed-upon amount contained in this Paragraph [of $2,000,000].

**V. Preliminary approval of proposed settlement agreement**

On January 5, 2012, Plaintiffs filed a Motion for Preliminary Approval of Class Action Settlement Agreement and Notice to Class (#85). On January 30, 2012, this court held a preliminary approval hearing and heard arguments by the parties in support of their requests to: (1) grant preliminary approval of the Class Action Settlement Agreement; (2) approve the form of Class Notice agreed upon; (3) designate counsel to represent the Class and Subclass; and (4) set dates for opt-outs, objections and return of claim forms, and for a final fairness hearing. Based on the filings and oral arguments made by the parties, this court concluded that the proposed class met the requirements of Rule 23 of the Federal Rules of Civil Procedure and that the proposed settlement was within the range of possible approval. The court, therefore, granted the Motion for Preliminary Approval of Class Action Settlement Agreement and Notice to Class

(#85).

On January 30, 2012, this court entered a Preliminary Approval Order (#86). In the Order, the court: (1) granted preliminary approval for the proposed settlement after finding that it was within the applicable range of fairness and reasonableness; (2) conditionally certified a Class and Subclass for settlement purposes; (3) appointed class counsel for the Class and Subclass; (4) approved the proposed form of mailed notice to the Class and Subclass, to be directed to the last known address of each Class and Subclass member as shown in Defendant's records, by March 15, 2012; (5) set a July 17, 2012, deadline for claim forms to be postmarked; and (6) set a May 11, 2012 deadline for objections or requests for exclusions from the proposed settlement. Additionally, this court scheduled the final fairness hearing on May 31, 2012.

**VI. Notice, requests to opt out, and objections**

On May 24, 2012, L. Stephens Tilghman signed an affidavit that was filed as Exhibit B to Plaintiffs' Memorandum in Support of the Motion for Final Approval (#103 exh. 2). As of the date of the affidavit, notices were sent, via First Class Mail, to 14,868 class members at their last known addresses. Out of the total 14,868 mailings, 2,815 recipients were construed to be members of the Class and 12,049 recipients were considered to be members of the Subclass. Thus, as of May 24, 2012, Plaintiff had voluntarily credited about 81% of the affected accounts. The disparity of four recipients has not been clarified by the parties. Out of the total 14,868 mailings, 135 mailings were returned as undeliverable by the post office. Tilghman was able to identify new addresses for 94 of the 137 mailings that were returned. Again, the affidavit does not explain the disparity between the attested-to 135 vs. 137 returned mailings. Thus, notice of the proposed settlement was received by 14,798 out of 14,868 total class members, which is 99.56% of the class. The deadline for submission of claim forms was July 17, 2012. As of May

24, 2012, 833 completed claim forms were received by Tilghman, totaling 5.6% of the class. Additionally, as of May 24, 2012, 19 members of the settlement class had submitted opt-out notices to Tilghman. One more opt-out notice was received by this court on May 8, 2012, for a total of 20 exclusions, totaling 0.13% of the class.

**VII. Final fairness hearing**

On May 31, 2012, the court held a final fairness hearing. Eric Holland argued for the class members, and Jeffrey Russell argued for BANA. The court also allowed argument on the record from Gregg Renegar for objectors Chris Risener and LaCrista Bagley, who have filed a separate individual suit in the U.S. District Court for the Western District of Oklahoma and Emil Lippe for amicus Paula Randall, who opted out and was pursuing an individual action. Due to the risk of potential collusion between the two parties with standing, this court decided that hearing the arguments of objectors and excluded parties would provide an alternative perspective.

**VIII. Subsequent questions regarding quantitative and legal positions**

Following the final fairness hearing, the court issued an order directing the parties to answer certain questions (#114). Among other things, these questions sought both empirical data regarding the Class's recovery under the settlement agreement as well as a clarification of each party's legal position pursuant to the framework approved in *Isby v. Bayh*, 75 F.3d 1191 (7th Cir. 1996). Defendant, Plaintiffs, and amicus provided their responses on July 25, 2012 (#116, #117, and #118). Amicus filed a supplemental response on September 7, 2012 (#119).

As of July 23, 2012, five days after the court-mandated deadline of July 17, 2012, the settlement claims administrator had received 1,279 claim forms. Of the Class Members, 266

claims were received for the $50 written request payment, 81 claims for the $75 credit reporting

payment, and 25 claims for the $25 tax payment. For Subclass Members, 217 claims were

received for the $75 credit reporting payment and 93 claims for the $25 tax payment. (#116 p.2;

#117 p.2).

BANA represents that as of their July 25, 2012 filing, it has already credited "the

majority of Class Members" and that there are "a small number of Class Members whose loan

accounts require additional investigation for whom BANA is in the process[] of crediting

payments. BANA estimates this figure to be approximately 300 accounts." (#116 p. 11). As

discussed above, about 81% of the accounts had been credited by the end of May, 2012. It is

unclear whether BANA is still in the process of crediting the accounts that have not yet been

credited, excluding those 300 accounts requiring additional information, or whether it has

stopped crediting accounts pending the resolution of this motion. Also, it is unclear whether

BANA meant that all the Class Members have had their accounts credited already excluding

those 300 accounts.


### ANALYSIS

Under Rule 23(e)(2) of the Federal Rules of Civil Procedure, a court may approve a

settlement in class action litigation only if it finds, after a hearing, that the settlement is "fair,

reasonable, and adequate." In evaluating the fairness of a settlement, a court must consider: (1)

the strength of plaintiffs' case compared to the amount of defendants' settlement offer; (2) an

assessment of the likely complexity, length and expense of the litigation; (3) an evaluation of the

amount of opposition to settlement among affected parties; (4) the opinion of competent counsel;

and (5) the stage of the proceedings and the amount of discovery completed at the time of

settlement. *Synfuel Tech., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006), *citing Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996). Although Plaintiffs have exhorted that it is "well-established" that "compromises of disputed claims are favored by the courts," *Williams v. First Nat. Bank*, 216 U.S. 582, 595 (1910) and that the Seventh Circuit has held that "[f]ederal courts naturally favor the settlement of class action litigation," *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996), this is only half the story. It is also true that "district judges must therefore exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions to consider whether the settlement is fair, adequate, and reasonable, and not a product of collusion." *Mirfasihi v. Fleet Mortg. Corp.*, 450 F.3d 745, 748 (7th Cir. 2006) (internal quotation marks omitted). This is because "the district judge in the settlement phase of a class action suit [is] a fiduciary of the class, who is subject therefore to the high duty of care that the law requires of fiduciaries." *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 280 (7th Cir. 2002). Thus, the court has taken the greatest care to analyze each factor carefully and to explain its reasoning in detail.

## A. Strength of plaintiffs' case compared to the amount of settlement offer

The Seventh Circuit has said that the "most important factor relevant to the fairness of a class action settlement is… the strength of plaintiff's case on the merits balanced against the amount offered in the settlement." *Synfuel*, 463 F.3d at 653 (editing marks omitted). In making this comparison, the Seventh Circuit recommends that district courts "quantify the net expected value of continued litigation to the class" by "estimating the range of possible outcomes and ascribing a probability to each point on the range." *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 284-85 (7th Cir. 2002). Although a precise valuation is not expected in all cases, this court must make a "ballpark valuation". *Id*. at 285. As will soon become evident, the value estimates

and estimation structure provided by the parties are not entirely clear. In some places, they are, as best as can be reconciled, self-contradictory. Thus, the opinion has attempted to make sense of the filings and has given parties the benefit of the doubt whenever possible.

During the final fairness hearing, this court asked both parties to provide estimates of the value of continued litigation to the class. In regards to the likelihood of success on the merits of their claims, Plaintiffs' counsel responded that their case "is by no means risk-free" (#103 p.19). In order to discuss the likelihood of success on the merits, each claim must be separately addressed. Plaintiffs have taken the position that at some point before trial, they would need to elect their remedies and opt to pursue their strongest claims, which they have indicated are the breach of contract and RESPA allegations (#117, p. 3).[8] They have therefore conducted a *Synfuel* analysis only for those two claims. Accordingly, this opinion addresses only those two claims.

*Class certification*

As a preliminary matter, the hurdle of class certification poses a significant risk because if class certification were denied, the value of each individual plaintiff's case would be reduced to a point such that litigation would be infeasible. In their motion filed before the proposed settlement agreement, Plaintiffs sought to certify the Class and Subclass pursuant to Rules 23(a),

---

[8] Regarding the Illinois Consumer Fraud and Deceptive Practices Act claim, Plaintiffs note that during pre-settlement negotiations, "it was quickly determined that a number of factors precluded further discussions, including: 1) Overlap between the claims under the ICFA and other claims being advanced; 2) Increased possibility of relief under other claims being advanced; 3) Factually, Defendants never received or otherwise had control of the mortgage payments at issue, thereby making such claims extremely difficult if not impossible on the merits; 4) The perceived difficulty in attempting to certify such a subclass, notwithstanding the factual issues." (#117, p.3).

Additionally, during the final fairness hearing, BANA argued that "[t]here is no promise—there was no representation made by the bank that we would ever credit payments that weren't actually received. So there's no representation out there that we ever—and there's no misrepresentation, in other words—there's no promise made that we would say to you, 'Well, you know, if you sent your check somewhere else, we're still going to credit you.' That's just not, not the case. So we think there are real problems with, with the consumer fraud type claims as well." (Tr. 85:3-10). *See also* (#116 p.4).

(b)(2), and (b)(3) (#77, p.1). As a prerequisite, a proposed class must be 1) so numerous that

joinder of all members is impracticable; 2) there are questions of law or fact common to the

class; 3) the claims or defenses of the representative parties are typical of the claims or defenses

of the class; and 4) the representative parties will fairly and adequately protect the interests of the

class. Rule (b)(2) class actions may be maintained if the party opposing the class has acted or

refused to act on grounds that apply generally to the class, so that final injunctive relief or

corresponding declaratory relief is appropriate respecting the class as a whole. Rule (b)(3) class

actions may be maintained if the court finds that the questions of law or fact common to class

members predominate over any questions affecting only individual members, and that a class

action is superior to other available methods for fairly and efficiently adjudicating the

controversy.

BANA notes that it would aggressively contest class certification on the grounds that 1)

there were large factual variations surrounding individual borrowers' circumstances; 2) that the

plaintiffs would have difficulty demonstrating actual damages as BANA had already begun to

voluntarily credit the missing payments, supplying its own funds to make those payments; and 3)

BANA had initiated other voluntary steps, including suspending credit reporting and the

cessation of late fees and defaults (#100, p.9). Further, BANA notes that

> The unique circumstances of each of the three Plaintiffs demonstrate that this is
> not a 'one size fits all' class. For example, Mrs. Vought paid by check, while Mr.
> Frock and the Skutacks paid via automatic bank deduction. The Skutacks sent in
> proof of payment and had their accounts credited (rendering them part of the
> Subclass). Mr. Frock stopped paying his mortgage and abandoned the property.
> Mrs. Vought's account was credited later.

(#116, p.7). These objections are, to a limited degree, valid, but in this court's opinion, not so

strong that they cannot be overcome. Regardless, as class certification has not yet been fully

litigated, this opinion, which analyzes the sufficiency of the settlement agreement, will proceed

assuming that the class is certified.

*Strength and value of breach of contract and unjust enrichment claims*

Regarding the breach of contract and unjust enrichment claims, class counsel noted that they could prevail on only one of those two causes of action because the legal underpinnings of these two were mutually exclusive. After lengthy questioning from the bench, class counsel grudgingly estimated the likelihood of prevailing on the breach of contract or unjust enrichment claim to be around 50% (Transcript of Final Fairness Hearing, 61:13-62:5 (hereinafter "Tr.")). At the hearing, BANA concurred with Plaintiffs' estimate of success (Tr. 76:16-18; 82:19-21). Later, in its response to this court's post-hearing questions, BANA estimated that Plaintiffs' probability of prevailing on the breach of contract claim to be 25% and on the unjust enrichment claim to be 30% (#116, p.8), but does not fully describe whether this includes an estimate for the probability of certification. To support their lower estimate, BANA noted that it had fairly solid legal defenses for this claim. Regarding breach of contract, BANA noted that it was in fact TBW's duty to forward the payments to BANA (#100, p.9), that no actual contract existed between BANA and the borrower-plaintiffs, and thus, they had no legal duty to compensate them for any payments made (Tr. 83:24-84:1; #116, p.8). Similarly, in regard to the unjust enrichment claim, BANA would argue that it never received the misdirected payments; rather, since the FDIC seized the lockbox bank, the funds were either misappropriated by TBW, or were in the possession of the FDIC. (Tr. 77:1-13; #116 p.8).

In contrast, Plaintiffs uprated their estimate of prevailing on the breach of contract claim to 75%, assuming that class certification will be approved (#117, p.5). Similarly, counsel for excluded party Randall emphasized BANA's promises to Plaintiffs and Class Members when he argued the following:

"[L]et's say we're trying this case and we present to them the fact that here's Joe and Susie Plaintiff that made their payments timely and that weren't given credit and now Bank of America is sitting there saying, "No, we don't have any proof that you made the payments," and they say, "Well, here's my canceled check," and they still say, "Sorry." And then you tell that jury in the box that these people had been told publicly by Bank of America, "Don't worry. Everything's going to be fine. We're going to give you credit."

Now, I do not purport to be familiar with the average juror in this district. But I would suspect that the average juror in this district who's confronted with the issue of, "Here's somebody that actually made a payment on a debt that they owed and they've got proof that they made that payment. Is it okay to treat them as if they hadn't paid?"—I don't think there are going to be very many people around in this district that would say, "Oh, it's not important whether you made a mortgage payment or not."

(Tr. 127:7-128:1).

In commenting for the record, the court also noted that jurors in this court are "extremely conservative jurors", averse to awarding large verdicts (Tr. 66:23-69:14) ("[Y]our comment about likelihood of success also ties into the success of getting a jury here to award 7.5, 15, 30 million—you would be talking about the largest verdict ever given in this Federal Courthouse in Urbana, Illinois.") But by the same token, it is not inconceivable that conservative jurors would not only be very protective of the homes in which they live and for which many are likely paying mortgages, but would also be more likely to be sympathetic to plaintiffs who undisputedly paid their mortgages in a timely fashion and yet were wrongfully penalized due to an administrative or bureaucratic oversight on the part of a large corporate bank.[9] Furthermore, such a jury would likely look differently on injunctive relief with high monetary consequences as compared to a verdict giving pure monetary damages.

Thus, after carefully considering the arguments from counsel and this court's prior experience, this opinion adopts an estimate of the chance of Plaintiffs prevailing to be 75%.

---

[9] *See also* comments by the bench re a juror in a prior case indicating that she could not be fair because the estimated valuation of damages greatly exceeded the *present value of her home*, showing that she used her home value as a yardstick.

*Value of equitable relief*

The probability of success must be gauged against the value of each outcome to create an expected value or range of expected values. Regarding the equitable relief of crediting the mortgage accounts, Plaintiffs have estimated that the value of crediting the mortgage accounts to be between $7.5 and $15 million (Tr. 19:5-9). Defendant did not dispute this range (#115, p. 5). As the court could not find on the record a mathematical rationale for this number, this court has conducted its own rough estimate. Presuming that the facts claimed by the named plaintiffs are in fact representative of the class, which they should be, the value of each class member's monthly mortgage payment would range approximately between $500 (plaintiff Frock, #63 ¶ 6) and $1,200 (plaintiffs Vought, #63 ¶ 5). There are 14,868 class members in this case. Thus, the estimated range of benefit for crediting each Class Member's account is between $7.5 million and $18 million, thereby comporting with the estimate provided by Plaintiffs.[10] Therefore, this opinion will proceed by accepting Plaintiffs' estimated values of $7.5 to $15 million.

The value of crediting or refunding late fees similarly requires an estimate by the court. BANA attested at the final fairness hearing that the amount of late fees that would be either waived or refunded to approximately $3 million, without providing any mathematical reasoning (Tr. 79:15-17). Defendant's counsel also explained that this was the first time that Plaintiffs were informed of this number, and Plaintiffs did not contest this number. However, BANA also attested that 1) they "did not assess any late fees on the accounts during the 60-day period beginning on the effective date of transfer of the servicing. Any late fees were assessed after the 60-day period and only because BANA had not received confirmation concerning which borrowers' payments had been received by TBW," (#116, p. 9); that 2) that BANA did not

---

[10] Of course, a sample size of two data points is hardly statistically significant and accordingly, no representations may be made regarding the distribution of the mortgage payment population.

receive the late fee funds in "most instances" (#116, p.8); and that 3) "approximately 58% of Class Member accounts have" received the relief of waiving or refunding unpaid late charges as of BANA's filing on July 25, 2012" (#116, p.12). Either late fees were predominantly not assessed and accordingly were not waived or refunded, or late fees were predominantly assessed and thus were waived or refunded. Unlike with the mortgage payments, no one has proposed that class members erroneously paid their late fees to TBW. Also unlike with the uncredited payments, late fees were either received by BANA or should never have been assessed in the first place. This conundrum aside, assuming that every single class member was assessed a late fee would result in a nominal late fee of $201. This number comports with the assumption provided by *amicus* and excluded class member Randall, who estimated that each class member was assessed two late fees at $100 each (#118, p.6). This value therefore has some superficial accuracy. However, regarding BANA's statements, it is unlikely that *all* the class members were assessed late fees, and other than Randall's assertion, this court could not find any party arguing that each class member was assessed two late fees. Accordingly, a better estimate of the late fees would be that half the class was assessed a $200 fee or that the entire class was assessed a late fee of $100. Thus, this court adopts an estimate of the value of remedying the late fees to be $1.5 million.

The value of issuing IRS Form 1098 to class members similarly requires an estimate by the court as no estimate was provided by the parties. Based on counsel's representations, it appears that the 1098s were issued to settlement class members in the tax year 2011. The methodology to derive an estimate is of greater difficulty and uncertainty than the previous two forms of relief as there are numerous assumptions that do not apply equally to all class members. First, an IRS Form 1098 will only have any value to those settlement class members who

itemized their deductions for tax year 2011. For those individuals who do itemize, they will have varying impacts on their final tax liability. For instance, an individual who is in the 35% marginal tax bracket will benefit more significantly than an individual who is in the 15% marginal tax bracket. However, setting aside the inherent guesswork in estimating the value to the class, this court will assume, based on an aggregate analysis of 2005 tax year returns, that 35% of the settlement class itemized their deductions in 2011.[11] Additionally, this court will estimate that the average tax bracket is 15%.[12] This court will also assume that based on an average missed mortgage payment of $1,009, $750 was mortgage interest. As a result, the estimated value to the settlement class is $585,427.

Finally, based on this court's understanding of the party's arguments, neither party has suggested that a legally supportable judgment awarding partial liability on these missed payments is viable. Based on Defendant's affirmative defenses, the class members would be entitled to either full recovery or no recovery. Therefore, the range of expected values to credit class member's uncredited payments is between $5.625 million (75% chance at $7.5 million) and $11.25 million (75% chance at $15 million), given a 25% chance that the jury will find for BANA, with zero recovery. For late fees, the expected value is $1.125 million (75% of $1.5 million). Last, for the IRS Form 1098, $439,000. The total expected value to the class for the equitable relief provided after a trial is therefore between $7.2 million to $12.8 million, the variance arising solely from the uncertainty over the mean value of the class's mortgage payment.

---

[11] *See*, http://taxfoundation.org/article/most-americans-dont-itemize-their-tax-returns
[12] http://www.dailyfinance.com/2012/01/25/surprise-your-tax-burden-is-lighter-than-you-think

*Value of monetary relief*[13]

As for monetary damages, BANA's position is that if Plaintiffs were to prevail, the total of any and all damages, including the breach of contract and unjust enrichment claims, would be limited to the statutory penalties available under RESPA, which provides for a cap at $500,000 (#116 p. 5). Because of the low likelihood that any qualified borrower correctly submitted a qualified written request pursuant to the requirements in RESPA, BANA opined that the probability of a full recovery of $500,000 was 5% (#116, p.5). Similarly, their medium estimate of damages, based on the 266 class members who submitted a claim form alleging they submitted a written request each receiving the $1,000 statutory penalty, is a 20% chance of receiving $266,000. Finally, BANA's low estimate was $100,000, based on a "speculative estimate of the number of Class Members who could substantiate their RESPA claims," with a 25% probability. These numbers only sum to 50%. In reference to these estimates, BANA assumed the other 50% chance was of a complete defense verdict as suggested at the final fairness hearing (#116, p.6).[14] Thus, BANA's expected value for any monetary relief comes to $103,200.

Plaintiffs have taken the position that regarding the breach of contract claim, the dollar

---

[13] Neither party has been asked to discuss, and has not discussed at length, the legal basis for any entitlement to monetary damages under a breach of contract cause of action in light of the fact that full specific performance would be guaranteed pursuant to the terms of the settlement agreement and BANA had not in fact received any mortgage payments. Class counsel hinted that borrowers who suffered "real affected damage on credit reporting" would not be limited on damages on the breach of contract (Tr. 16:22-25; 20:8-12; 38:17-23). *See, e.g.*, Restatement (2d) of Contracts §§ 344, 351 (discussing consequential damages.)

[14] Notably, this 50% estimate of a "complete defense verdict" conflicts with their revised estimates of 75% on the breach of contract claim and 70% on the unjust enrichment claim. Further, and oddly, BANA has also stated that "[their affirmative] defenses notwithstanding, BANA submits for the purpose of assessing the settlement that there is a 35% chance that a jury could find in favor of Plaintiffs as to at least some of the Class Members on the RESPA claims." (#116, p.9). This court does not understand how the chance of prevailing could be so low *in spite of* their legal defenses. Normally, the probability of the high, medium, and low recoveries would be multiplied by the probability of success, but since the two have been conflated, and in order to maintain consistency with BANA's other assertions and estimates, this opinion proceeds with the 50% estimate as it is more relevant in the context of BANA's argument.

range of recovery on the contract-based claim, excluding the value of the remedial relief, is $3,717,000, $1,486,800, and $0 (high, medium, and low.) The estimated likelihood of these recoveries is 20%, 20%, and 60%, respectively (#117, p. 4). Plaintiffs did not provide any rationale for these valuations in their Response on July 25, 2012. Further, as they do not account for the probability of prevailing, but rather are estimates only of the award assuming that they prevail, the analysis for these numbers must also take into account a 50% chance of prevailing in order to be consistent both with counsel's testimony at the final fairness hearing as well as with BANA's estimate. Plaintiffs' expected value for the monetary relief therefore comes to $520,380.

*Strength and value of RESPA claim*

As discussed above, BANA's estimates of recovery under RESPA, provided that Plaintiffs prevail, are 10% at $500,000; 40% at $266,000; and 50% at $100,000. Both Plaintiffs and Defendant agree that the primary defense to the RESPA claim would be that many of class members' letters did not qualify as statutory RESPA Qualified Written Requests, and therefore would not have triggered any statutory obligations on BANA's part (#116, p.9; #117, p.4). As discussed above in footnote 14, this court cannot make heads or tails of BANA's estimates of probability. Defendant estimated the probability of Plaintiffs prevailing on the RESPA claim to be 35%, "defenses notwithstanding," (#116, p. 9), but in the same filing also estimated that the total probability that "any damages suffered by the class, if certified, [which] would be limited to the statutory penalties available under RESPA," to be 50% (#116, p.5-6). In the interest of consistency, this court will therefore adopt the same expected value for BANA's estimate as discussed above: $103,200.

Plaintiffs' position is that the probability of success on this claim is 75%, with a

probability of a full recovery of $500,000 to be 25%; 20% at $148,680, and 55% at $0 (#117, pp.4, 5) for an expected value of $116,052.

Accordingly, the net expected value of continued litigation, estimated by counsel, ranges between $7.3 million (lower bound for the equitable relief, $7.2 million plus BANA's estimate of damages, limited to $103,200 as per their argument) and $13.4 million (upper bound for equitable relief plus Plaintiffs' estimate of damages from the breach of contract, $520,380, plus Plaintiff's estimate of damages from the RESPA, $116,052).

*Value of settlement*

With a settlement, the outcomes are guaranteed; the probabilities of both injunctive and monetary relief are pegged at 100%. The expected value of the injunctive relief is therefore the full value of the agreed-upon concessions as estimated by counsel and discussed above, $7.5 to $15 million.

As for the monetary relief, a theoretical calculation of "potential value" may be made. However, given that such a prescriptive analysis falls far from the observed number of claims actually filed, and given that there is no *cy pres* residual in the settlement agreement, it is more practical to examine the monetary amount that would actually be paid rather than a hypothetical value that represents no actual value to the class.

The first type of monetary relief is a $50 payment for class members who paid TBW a mortgage payment but did not receive credit for it as of December 1, 2011. The agreement caps this form of relief at $500,000. However, as of July 23, 2012, which is after the court-mandated deadline, the administrator only received 266 claims for this type of relief. The second type is $75 for class members who reported an adverse effect on their ability to obtain, extend, or continue credit. Of this type, 81 claims were received from class members and 217 claims for

subclass members. Finally, the last type is $25 for members who itemized deductions in 2009. Of

this type, 25 claims were received from class members and 93 from subclass members.

Accordingly, out of the $500,000 maximum liability (for the first type only), under the terms of

the settlement agreement, BANA would be obligated to provide $38,600 in monetary relief to the

class.

Therefore, the total actual value of the settlement to the class is approximately $7.5 to

$15 million. This range is not substantially different from the net expected value of continued

litigation, with an estimated 75% chance of plaintiffs prevailing, as discussed above. Discounting

the future value of continued litigation to the present value is mostly irrelevant since the vast

bulk of the calculated value is in injunctive relief, and as of May 2012, BANA claimed that they

had credited at least 81% of class members. As for calculating the future value of the monetary

relief, "even a person with a high discount rate may not care much whether he receives $15 to

$30 now or in the future, since it is such a trivial amount of money even to a person who is

usually strapped for funds." *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 285 (7th Cir. 2002).

Given the similarly low amounts offered in the settlement agreement and the even lower claim

rate, the future value is negligible in comparison.

*Voluntary remediation as impacting evaluation of strength of case*

Beyond the straightforward balancing calculation, there are other circumstances that raise

concern regarding the strength of Plaintiffs' case. First, it appears that all injunctive relief will be

provided to all individuals who made payments that were not credited by BANA. Even

individuals who exclude themselves from the proposed settlement will receive all injunctive

benefits, including crediting of the uncredited payments, reversal of late fees, the issuance of a

new form 1098 in tax year 2011, and credit reporting corrections (Agreement § 3.01; #116 p.1).

In other words, the only difference between an individual who opts out of the proposed

settlement and an individual who does not opt out is that class members who stay with the

default have the potential to recover up to $150.00 in monetary relief and will receive the letter

describing the missing payment issue and subsequent crediting of accounts (#116 p.1). This

seems like an odd result if BANA believed that they have no obligation to take these steps

independent of this proposed settlement. Why unilaterally provide a remedy that, on its face,

appears to admit liability, if not obligated to do so? The parties assert that processing all the class

members in a block and not selectively crediting those who have not opted out is simply more

efficient, and that the time cost required to not credit those who exclude themselves outweighs

the cost of applying the credit. This may be true. But even though the proposed settlement is not

final, BANA has also declared that it has already provided the injunctive relief to a majority of

the potential class members (again, 81% as of late May, 2012). This also seems strange

considering that the proposed settlement agreement is neither final nor binding on the parties.

Our sister court, in considering whether AT&T, as a defendant in a class action, would

have stopped charging certain contested taxes but for a settlement agreement in that case, wrote:

> The Settlement's value to consumers in requiring Defendant to cease collecting
> the Internet taxes, however, depends on the probability that AT&T would have
> voluntarily ceased those collections independent of the Agreement. If AT&T
> would have stopped charging those taxes regardless of whether it entered into the
> Agreement, for example, then the marginal value to the Class of the Agreement
> with respect to stopping the impugned conduct would be zero. Conversely, if…
> Defendant would have kept charging the relevant taxes but for the Settlement,
> then the benefits that the Class Members would realize from the Agreement's
> provision requiring AT&T to cease collecting Internet Taxes would indeed be
> $1.98 billion.

*In re AT&T Mobility Wireless Data Services Sales Tax Litigation*, 789 F. Supp. 2d 935, 960

(N.D. Ill. 2011). Certainly, if BANA were to have credited the accounts regardless of the

settlement (or for that matter, the suit), that remedy should not be considered part of the benefit

for forfeiting the right to sue. Analogously, but less on all fours, the Supreme Court recently held that attorney fees may not be awarded to the prevailing party under the catalyst theory if that party "failed to secure a judgment on the merits or a court-ordered consent decree, but has nonetheless achieved the desired result because the lawsuit brought about a voluntary change in the defendant's conduct." *Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dept. of Health & Human Res.*, 532 U.S. 598, 600 (2001). Although that decision turned on the definition of "prevailing party", a similar rationale applies. When voluntary behavior by the alleged wrongdoer results in the desired outcome but bereft of a full adversarial process, there is an increased burden to show that the exceptional treatment asked for—there, attorney fees despite the "American Rule"; here, approval of the settlement in spite of "the highest degree of vigilance in scrutinizing proposed settlements of class actions"—is indeed warranted and should be granted. This scrutiny must be maintained despite a court's natural tendency to favor the settlement of class action litigation, thereby clearing an onerous and lengthy case off the docket as well as saving both parties extensive transactional costs. *See, e.g., Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996).

However, this perspective should also be tempered. For example, under the Federal Rules of Evidence, evidence of remedial measures is not admissible to prove negligence or culpable conduct. Fed. R. Evid. 407. The primary reason is to "not discourage[e] them from taking[] steps in furtherance of added safety." *Id.*, advisory committee's note. Similarly, to disincentivize BANA from taking actions for non-litigation-related reasons, such as to improve customer relations or to take advantage of beneficial tax timing, would be unfair. Regardless, the fact that BANA not only voluntarily and unilaterally credited mortgagees before it was required to, but also credited those individuals who opted out, suggests that it tacitly recognizes, even if it will

not admit as much, that its position is not as strong as it lets on.

*No residual distribution of unclaimed funds*

This court is also concerned that the settlement agreement has no terms directing that unclaimed funds be distributed in *some* fashion. Termed, variously, a "*cy pres* remedy" or "fluid recovery", "the reason for appealing to *cy pres* is to prevent the defendant from walking away from the litigation scot-free because of the infeasibility of distributing the proceeds of the settlement." *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784 (7th Cir. 2004). In *Mirfasihi*, the Seventh Circuit reversed an approval of a settlement agreement because the agreement included, among other questionable features, "the reversion of unclaimed refunds to the putative wrongdoer." *Id.* at 785. Indeed, "[a] reversion provision might encourage a more generous settlement offer." *Id.* Recovery of $25, $50, or $75 for months of trouble, conditioned on having *a written letter and tax forms from three years ago* hardly seems generous. Here, the bench went so far as to specifically question Defendant's counsel on this issue. In response to the suggestion that the unclaimed residual be distributed to a nationwide *pro bono* legal aid group assisting in mortgages, Mr. Russell stated that "it's hard to see how that is really something that the class members themselves would be asking for" (Tr. 146:5-7). And in response to the court's follow-up question about distributing the residual among the class members who actually filed claims, Mr. Russell intimated that "[n]ot to be cynical about this; but often that's done in order to, you know, raise the number so that you can pay attorneys' fees. And we didn't do that in this case." (Tr. 146:12-15). There is also the concern that were the full capped value to be split among all the claimants, that each would receive a windfall (although $733 per claimant does not strike the court as grossly unjust.)

While the $500,000 cap split among all 14,868 class members is small at $33.63 per

individual in comparison to the proffered $150 maximum per claimant, only 682 members filed a claim form along with the evidence required—a scant 4.5% of the notified pool. Perhaps class members did not understand how to file a claim or were confused by the legal language, or the barriers to filing were so high as to make it not worth the time or even possible to claim the $25 or $50 or $75 (what percentage of aggrieved customers make a "written request" today when there are telephones and email?) Or it may simply have been that only a tiny minority of the class was actually affected. For example, BANA estimated at the final fairness hearing that the number of class members who had their credit score affected was "very limited," suggesting that they might have known that the proffered cap was largely posturing (Tr. 50:19-22). *See Mirfasihi*, 356 F.3d at 783 ("The part of the $2.4 million that is not claimed will revert to Fleet, and it is likely to be a large part because many people won't bother to do the paperwork necessary to obtain $10, or even a somewhat larger amount.") Without more evidence, it is not possible to determine the reason for such a low turnout. But to negotiate a cap of $500,000 only to be liable for $38,600 paints a picture of BANA skipping and whistling all the way back to the bank.

Accordingly, as the strength of Plaintiffs' claim is high and the expected value of continued litigation very close to the actual value of the settlement, this factor weighs neither for nor against approving the settlement.


**B. Likely complexity, length and expense of the litigation**

The second factor that must be considered is the likely complexity, length and expense of continued litigation. Obviously, if this court approves the proposed agreement, the present lawsuit would end and class members would realize immediate benefits as a result. This

realization could also be delayed if this decision is challenged on appeal, however unlikely.

Alternatively, it is nearly guaranteed that if this settlement is not approved that protracted and

costly litigation would ensue. For instance, at the time the parties requested a stay to work

towards a settlement, Plaintiffs had filed a Motion to Certify a Class, Appoint Class

Representatives, and Appoint Class Counsel (#77). Defendant has asserted that they would

vigorously oppose the certification of the proposed class, and any decision would inevitably be

appealed. If the class were certified, further discovery would be required and dispositive motions

would be filed, requiring lengthy work by both parties and the bench. In addition, the parties

have estimated that a trial in this case would require at least three weeks. After a verdict at trial,

it is likely that there would be post-trial motion practice and appeals. Overall, the significant

complexity of the issues this case presents, the increased length of time that would be necessary

to resolve this case by continued litigation, and the corresponding dramatic increase in costs

weigh in favor of approving the proposed settlement.


**C. Amount of objection to proposed settlement**

The third factor to consider is the amount of opposition to a proposed settlement among

affected parties. As of the deadline for exclusion and objections, seventeen class members have

requested to be excluded from the proposed settlement. This is a scant 0.11% of the class.

Additionally, only three members of the Settlement Class filed written objections to the proposed

settlement (#105, #106, #113), which is 0.02% of the class. In total, between class members who

either requested to be excluded or objected to the proposed settlement, only 0.13% of the

settlement class has demonstrated any objection to the proposed settlement. However, as

commentators have discussed, the dearth of objectors or individuals requesting exclusion is

hardly a good indicator of class approval. *See, e.g.*, Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 Fla. L. Rev. 71, 84 (2007). In fact, a 1996 study for the Federal Judicial Center found that between 42% and 64% of class action settlements in four major judicial districts had no filings by objectors. Thomas E. Willging et al., *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules* 57 (1996). Here, not only were there three written objections, counsel for one objector (Mr. Renegar for Mr. Risener) and counsel for one excluded party (Mr. Lippe for Ms. Randall) made appearances from out of state to argue during the final fairness hearing. Although the fact that both Mr. Risener and Ms. Randall have competing plaintiffs' claims in other districts dampens the neutrality of their argument, that they are willing to pay for their respective attorneys to fly into Urbana and spend the time to argue against the settlement is not insignificant.

*Comment by named plaintiff Roger Frock*

The court was greatly concerned when it received an unsolicited letter directly from named plaintiff Roger Frock (#108) on June 18, 2012. His correspondence stated, in pertinent part:

> A few days [after making payments between August 2009 and November 2009 that went uncredited] I received another letter from BAC stating "if they did not receive a payment of $1,200.00 they would foreclose on my home December 20,2009". Not wanting to be forced out of my home with no place to go; I moved in with a friend and notified BAC I had moved out and would notify a lawyer and would see them in court. My lawyer (Mike Braun) then filed against BAC in Federal Court in Dayton, Ohio. We also sent a RESPA letter to two different departments of BAC; answered one requesting for more time to research the account and the other requesting proof of my August, 2009 payment with an address on where to send it. I sent the proof by certified mail and it was returned by the USPS stamped ADDRESS UNKNOWN.
>
> […]

I was then added to the suit that is now in front of you and your court. BOA has offered to take back the house and pay me $4,000.00 dollars. I was informed by Eric Holland that this was in the best interest of everyone involved and I should agree to this settlement. Now it has been almost three years later; I have lost my home, they have destroyed my credit and now BOA wants me to sign a short sale which states that I still live in the home. I refused to sign the document without crossing out the line stating I still live in the house.

[…]

Your Honor, I served this great nation during Vietnam; and after in the United States Navy and I am very proud of my time served it is a shame that my life is in shambles by company called BANK OF AMERICA. What they are offering is nothing close to the pain and suffering this bank has caused, not to me but many others who have just threw up their hands and gave up because they don't think the courts of our great nation will do anything to a company the size Bank of America. I believe in our justice system and this great nation. This nation even now as we are going through hard times will rise again and will always be the Greatest nation to live and raise a family.

In response, this court ordered Plaintiff Frock's counsel to respond to the issues raised by the letter and establish whether counsel even had authority to enter into a binding settlement (Text Order of June 18, 2012). On June 20, 2012, Eric Holland, counsel for plaintiff Frock, submitted a declaration responding to the order. Among several other asseverations, Mr. Holland indicated that "Mr. Frock confirmed that he continues to agree with and support the settlement, regarding it as fair, adequate and reasonable to him and the class." (#109 ¶ 7). Barely one week later, Plaintiff Frock sent a second letter directly to the court (#112). The entire substance of that correspondence is reproduced below:

Dear Honorable Judge Michael McCuskey:

I would like to apologize for the delay in sending this letter, I just returned from my honeymoon. I have reviewed your letter and also the declaration of Mr. Holland. I agree with everything Mr. Holland said in his declaration to the court and it was what we talked about on the phone, as his declaration said. Thank you for caring about my comments and this case.

Notably, several, if not all, of Plaintiff Frock's concerns had already been addressed in the settlement agreement filed with this court on January 5, 2012. Paragraph 2.28 of the agreement requires that "Defendant further agrees that the incentive award payment to Plaintiff Frock will not be applied to reduce the outstanding balance of his mortgage, and Plaintiff Frock agrees to cooperate in providing Defendant with a deed in lieu of foreclosure and possession of the subject property securing his Loan." Although there is no direct evidence of untoward behavior, and although this court is loath to pry into the sausage-making process of drafting settlement agreements, Frock's sudden change of heart raises a suspicious judicial eyebrow.

*Exclusion request by James and Barbara De Poppe*

While many of the opt-out letters were *pro forma*, this court received a letter requesting exclusion from James and Barbara De Poppe on April 20, 2012. Their letter is instructive. The relevant portions of their letter are reproduced here for context:

> Not sure of whether or not the above referenced Class Action Lawsuit applies to us, we thought we should respond to the notice. We were caught up in the transfer of loan servicing in August, 2009 and somewhere between August, 2009, and April, 2011, we believe this particular issue has been resolved. Through nothing but sheer determination on our part, somehow we managed to get the missing payment applied. We have copies of all our correspondence back and forth with all the parties we had to get involved from the Better Business Bureau, Washington State's Attorney General's Office, Office of the Comptroller of the Currency and BAC to mention a few. […]

> We know opinions are like assholes, everybody has one, but it is really too bad when a corporation like Bank of America is allowed to get so big that the left hand has no clue what the right hand is doing and the hard working American Citizen suffers as the result.

> Please let this letter serve as notice that we are requesting to be excluded from the above referenced Class Action Lawsuit. We find the possibility of receiving $150 an insult considering the amount of anguish and time we ourselves had to endure to fight for something we had no control or advance notice of transpiring. If we thought for one split second that $150 would get noticed by the huge

conglomerate known as Bank of America, it might be worth it, but you know about a snowball's chance in hell.[15]

*Objection by Chris D. Risenar and LaCrista A. Bagley*[16]

On May 10, 2012, Risenar and Bagley filed a joint Objection to Settlement Agreement (#91). These objectors are named plaintiffs in a case pending before the United States District Court for the Western District of Oklahoma—a case based on the same underlying facts as the case before this court. The initial complaint filed by objectors was dismissed in its entirety and at this point, their second amended complaint has been reduced to one count after dismissal of the remaining counts by the district court. The remaining count in objector's case is a claim against BAC Home Loans Servicing, LP, for an alleged violation of the Fair Credit Reporting Act ("FCRA"). At this point, there has been no discovery conducted in objectors' case. Objectors argue that the "amount of money the class members will receive is an absolute insult as compared to the totality of the damages the class has sustained." Factually, the situation that Risenar and Bagley describe is similar to that experienced by other parties who have filed documents with this court. They made a payment to TBW that was not credited by Defendant, and following this uncredited payment, they "received dunning notices and threats of foreclosure."

*Objection by Kenneth and Gayla Conway*

On May 30, 2012, Kenneth and Gayla Conway filed an Objection to Settlement

---

[15] Several issues beyond the mere sentiment expressed are worth highlighting. First, the De Poppes appear to be both educated and aware of their non-litigative alternatives, having contacted the Better Business Bureau and their state attorney general. And yet they were still unable to determine with any degree of certainty from the notice they received whether they even qualified to be a member of the class action. This raises some concern about the notice's clarity and whether that affected the low response rate. Second, they appear to be under the impression that it was their extensive efforts that resolved the issue, not the unilateral and voluntary act of defendant BANA in crediting their payment. Although purely conjecture because this court is not in possession of any facts regarding the timing of the credit, this letter suggests that BANA did not inform the De Poppes about why their account was credited.
[16] Risenar and Bagley were married in August 2009, but have since divorced.

Agreement (#105). In their objection, the Conways explained the difficulties they encountered in dealing with Defendant relating to the uncredited payment. They explained that they received numerous letters containing threats of foreclosure, which are attached to their objection. Additionally, they explained how they eventually were forced to take an early hardship withdrawal from their 401k account to attempt to avoid foreclosure. In commenting on the fairness of the proposed settlement, they explained:

> [We] strongly disagree with the settlement and feel as though it is a slap in our faces for all we had to endure. . . . [Defendant] caused undue stress, anguish, and mental fatigue between my husband and me. I do not know if other households were affected by the amount of correspondence that our family was, but again this settlement does not account for all that my family went through over the course of a nearly 6 month period. . . . I hope that after reviewing all that is given to them, the court may agree that the settlement is not fair and will make a reasonable decision on behalf of the mortgage holders.

In support of their comments, the Conways attached numerous documents evidencing the large volume of letters threatening foreclosure, amounting to a stack *one-half-inch thick*. The Conways have not alleged that they are maintaining an individual action.

The aggressive comments by objectors, and, disturbingly, Plaintiff Frock, are troubling. While the quantity of objections is sparse, the force of each is strong enough that the court weighs these objections against approval.


**D. Opinion of competent counsel**

The opinion of competent counsel is another relevant consideration in determining whether a proposed settlement is fair, reasonable and adequate. *Synfuel*, 463 F.3d at 653. Class counsel submitted declarations describing their qualifications.[17] Based upon these declarations,

---

[17] "Class Counsel" consists of the following: Eric D. Holland of Holland, Groves, Schneller & Stolze, LLC and Michael Donovan of Donovan Searles, LLC, as co-lead class counsel; Christopher M. Ellis of Bolen, Robinson & Ellis, as liaison counsel; and James C. Shah of Shepherd, Finkelman, Miller & Shah, LLP, Michael Braun of the Braun Law Group, P.C., Andrew S. Kierstead of Law Officers of Andrew

as well as this court's observations during hearings held in this case, class counsel is well-qualified and competent in the area of complex litigation and nationwide class action cases. Therefore, this court does not doubt that the settlement class and Defendant have competent counsel in this case. In this case, counsel for the settlement class and Defendant have provided opinions of the proposed settlement during the final fairness hearing on May 31, 2012, and in their written Motions for Final Approval of Settlement (#99; #101). The opinions provided express strong support for the proposed settlement, explaining in detail why they believe that it is fair, reasonable and adequate. (Of course, both of them negotiated and drafted the settlement; it would be shocking if either party came out against it at this stage.)

Further, "[t]he history of the litigation is a good indication in itself of lack of collusion." *Armstrong v. Bd. of Sch. Directors of City of Milwaukee*, 471 F. Supp. 800, 811 (E.D. Wis. 1979) *aff'd*, 616 F.2d 305 (7th Cir. 1980) *overruled on unrelated grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998). In *Armstrong*, the Seventh Circuit affirmed a motion granting approval of a settlement agreement because "there [was] nothing in the record to suggest any other conclusion and that the fees paid to class counsel, without more, will not support an inference of collusion in view of the district court's express finding that the amounts paid were less than the court would have awarded had the issue been presented." *Armstrong,* 616 F.2d at 325-26. Because the court is not so certain that the negotiated fees here would have been less than would have been awarded, in light of a complete absence of other evidence of collusion, it weighs this factor neutrally.

## E. Stage of proceedings and discovery completed

---

Kierstead, Peter N. Wasylyk of Law Offices of Peter N. Wasylyk, Scott E. Smith, L.P.A., and Charles Schaffer of Levin Fishbine, as executive committee members and co-counsel for the Class and Subclass.

The final factor is the stage of proceedings and the amount of discovery completed. *Synfuel*, 463 F.3d at 653. This aspect of the case considers "how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims." *Armstrong,* 616 F.2d at 325, *overruled on unrelated grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998). Thus, the inquiry is whether the claims' merits may be adequately evaluated.

Here, the proposed settlement was reached after the parties had briefed three motions to dismiss filed by BANA and had conducted fairly extensive discovery. With regards to discovery completed, the parties represent to this court that over 230,000 pages of documents were produced by BANA and organized and reviewed by class counsel. The parties have explained that this discovery provided sufficient information to ensure that there is an adequate basis to analyze the adequacy of the proposed settlement. BANA explained that "[t]he parties had the benefit of reviewing relevant documents produced by both sides and of analyzing the legal claims, at least at the dismissal stage. At that point, the parties determined that they each had sufficient knowledge of the facts and the law to make educated decisions about the degree of risk involved for both sides." (#100 p. 14). Despite the parties assertion that expansive discovery was conducted, which this court has no reason to doubt, the parties have not described the contents of those 230,000 pages of discovery. *Cf. Taifa v. Bayh*, 846 F. Supp. 723, 728-29 (N.D. Ind. 1994) (describing exactly what investigation took place in reaching the conclusion that the discovery conducted provided class counsel with a clear insight into the facts and strengths and weaknesses of their legal claims). Therefore, this court is left to infer that the discovery consisted primarily of BANA's records relating to the class members' accounts and various internal corporate communications. This might exclude relevant information that BANA might not have access to, such as discovery that would have demonstrated the scope of injuries sustained by class

members, beyond the failure to credit mortgage payments and the imposition of late fees.
Additionally, neither party mentions whether any discovery was conducted examining what type
of consequential damages were suffered by members of the class. Examples of this discovery,
which this court believes would have been helpful, would be credit rejections, increased rates on
loan applications, and other types of damages that would be expected to have been sustained by
the class if they wrongfully suffered adverse credit reporting.

Additionally, Plaintiffs' Memorandum in Support of Motion for Final Approval (#103)
refers to the Preliminary Expert Report of Thomas A. Tarter, which was included in Plaintiffs'
Motion for Class Certification (#78). In that preliminary report, Mr. Tarter explained that "many
documents that are routinely produced in residential mortgage lending and loan servicing
litigation have not been produced…. The aforementioned documents are important and if
produced, in my professional judgment will demonstrate how residential mortgage loan servicing
industry practices were violated." (#78 exh. 1, p. 21-22.)

As Motions to Dismiss have already been briefed and ruled on, some preliminary legal
claims have been eliminated. *See Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 589 (N.D. Ill.
2011) ("[T]he filing of Defendant's motion to dismiss suggests that the parties began the
litigation in an adverse posture."). However, this court suspects that if the case were to proceed,
both parties would pursue further discovery. Also, summary judgment motions have neither been
briefed nor adjudicated. Thus, the merits in this case are far from clear and cannot be compared
with one in which the settlement is produced on the eve of trial, where counsel would have been
in a better position to negotiate and this court in a better position to rule. Because the inquiry in
the "the stage of proceedings" does not focus on the efficiencies resulting from premature
adjudication, this factor weighs against approving the settlement agreement.

**F. Additional considerations regarding fairness, reasonableness, adequacy, and collusion**

*Not egregiously unfair*

This settlement is not egregiously unfair. Compensation would not be paid in coupons, *cf. In re Mexico Money Transfer Litig.*, 267 F.3d 743, 748 (7th Cir. 2001). The class members would not suffer a loss from the maladroit deployment of a common fund, in which they might be liable for their own counsel's fees, *cf. Kamilewicz v. Bank of Boston Corp.*, 100 F.3d 1348 (7th Cir. 1996). No class went home empty-handed, receiving only "emotional satisfaction," *cf. Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 783 (7th Cir. 2004). There do not appear to be any misalignment of interests within a single class, *cf.*, *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 626 (1997). There was no evidence to suggest that a reverse auction had occurred, in which "the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with in the hope that the district court will approve a weak settlement that will preclude other claims against the defendant." *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 282 (7th Cir. 2002). Surely the expected value of the injunctive relief of continued litigation matches closely with the settlement amount; both give a full remedy. But the likelihood of this outcome also occurring in front of a jury is very high (although surviving appellate review perhaps somewhat less.) Instead, the two primary fairness concerns are "the reversion of unclaimed funds to the putative wrongdoer" and the high multiple of attorneys' fees to the class's monetary recovery. *Mirfasihi* at 785.

*Court has no incentive to prematurely dispose of the matter*

District courts have also been accused of perpetrating the noble lie that while ostensibly protecting the class so as to perpetuate the illusion of fairness, they instead are motivated more by

docket-clearing and fear of rebuke by colleagues on the bench as well as future noncooperation

from lawyers involved in the deal. *See* Susan P. Koniak & George M. Cohen, *Under Cloak of*

*Settlement*, 82 Va. L. Rev. 1051, 1127 (1996). In 1996, a study for the Federal Judicial Center

found that about 90% of all the proposed settlements in class actions terminated between 1992

and 1994 in the Eastern District of Pennsylvania, the Southern District of Florida, the Northern

District of Illinois, and the Northern District of California were accepted without modification.

Thomas E. Willging et al., *Empirical Study of Class Actions in Four Federal District Courts:*

*Final Report to the Advisory Committee on Civil Rules* 58 (1996). This high rate of approval

occurred despite objections to the amount of attorneys' fees and the insufficiency of the award to

compensate class members for their losses. Comparably, this court is under no dramatic pressure

to clear its docket at this time. Also, as noted at the final fairness hearing, the judge ruling on this

motion to approve the settlement likely will not be the one presiding over the trial (Tr. 23-24;

86:21-87:2). Last, district court denials of settlement class actions, while infrequent, are hardly

anathema. *See, e.g.*, *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*, 55

F.3d 768, 822-23 (3d Cir. 1995); *In re Ford Motor Co. Bronco II Products Liab. Litig.*, CIV. A.

MDL-991, 1995 WL 222177 (E.D. La. Mar. 15, 1995).

*Class counsel fees*

A significant concern is that of the five *Synfuel* factors, none included an examination of

the amount of compensation that the defendants would pay class counsel. However, the Seventh

Circuit has required that the district court consider whether the settlement may have been the

result of collusive behavior. Furthermore, the appellate court has also provided guidance that the

value of attorneys' fees provisions should not be ignored when considering whether there was

collusion. *See Thorogood v. Sears, Roebuck & Co.*, 627 F.3d 289, 294 (7th Cir. 2010);

*Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742, 744 (7th Cir. 2008); *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 286 (7th Cir. 2002).

On one hand, the degree of the defendant's risk-averseness, including how much it values closing the book on its mistake by precluding any further lawsuits, is not a part of whether the class was adequately, reasonably, and fairly compensated. Class members had their accounts credited, their late fees reversed, their tax credit retroactively applied. Everything they asked for, they got. Or so argues class counsel. Except that the objectors and excluded individuals who wrote to this court were concerned about getting BANA's attention. One objector was upset because "a corporation like Bank of America is allowed to get so big that the left hand has no clue what the right hand is doing and the hard working American Citizen suffers as the result." And although some class members had their accounts credited within four months, some still have not had their accounts credited, two and a half years later. The comments of objectors and excluded individuals did not ring of gratefulness that their accounts were fixed and that they were receiving between $25 and $150 for their time and effort, but rather disgust at being thrown a pittance. Class counsel argues that those objectors who had suffered substantial negative impact should have excluded themselves. The lack of many objectors must mean (or so the argument goes) that the majority of class members are satisfied with their accounts being returned to the *status quo*. In fact, they might argue that most of them weren't even injured, as otherwise more of them would have actually filed claims. But excluding themselves defeats the very purpose of a class action. Even if a potential excluded individual could claim consequential damages of a thousand dollars in increased mortgage payments, it would be unlikely to be worth the cost to litigate.

BANA now admits it made a mistake. It didn't acknowledge their error to homeowners

early on, maybe because it took some time for the bureaucracy to realize that a mistake had occurred, decide what should be done, and start the remediation process. (This is especially true given that BANA didn't receive the missing payments.) That delay, whether due to lethargy, insouciance, or plain cautiousness, is ultimately what the objectors and excluded individuals seem most angry about. The question is not only whether class action settlements should take into consideration an ostensibly punitive component in the form of higher damages, but more practically, what legal claim or claims, if any, could even support higher damages. Counsel has not discussed those aspects yet, which, at least according to correspondence from class members, it might consider addressing. Besides, this kind of deterrent might properly be the domain of state and federal legislators or regulators, not mass tort law. *But see Deposit Guar. Nat. Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 339 (1980) ("The aggregation of individual claims in the context of a classwide suit is an evolutionary response to the existence of injuries unremedied by the regulatory action of government.")

Regardless, high attorneys' fees—that is, a high multiple compared to the monetary award to the class—might accomplish the deterrent purpose, even if indirectly. In theory, everyone wins: class members are put back in their original position, class counsel is incentivized to root out more wrongdoing and pursue new clients on a contingency basis, *qui tam*-like, and the bank must pay some ten million dollars out of its pocket in injunctive relief plus another two million to class counsel, presumably encouraging them to develop policies to prevent similar debacles from occurring in the future. *See, e.g.,* Richard Posner, Economic Analysis of the Law, 626-27 (5th ed. 1998) ("The most important point, on an economic analysis [of class actions], is that the violator be confronted with the costs of his violation—this achieves the allocative purpose of the suit—not that he pays them to his victims.") Taken without context,

the additional two million in class fees would serve to make the settlement more attractive by increasing the cost of the violation. And yet somehow this does not ring true. There must be some point at which the recovery to the class is so outweighed by attorneys' fees that even if the net cost of the two options is the same to the putative wrongdoer, the allocation is not fair.

The terms of the settlement, despite the superficially generous $500,000 cap, ended up being a zero-sum framework where the putative attorneys' fees award cannibalized the funds that would otherwise have gone to the class. Presumably, BANA does not care who it pays so long as it maintains its public image and precludes subsequent actions. Other courts have dealt with the problem of overcompensating the claiming class members by capping each individual member's recovery and directing the residual be paid to an alternate *cy pres* recipient. There might be other solutions.

The combination of a reversionary fund settlement and a clear sailing clause has given other courts reason to pause. Provisions for clear sailing clauses

> decouple class counsel's financial incentives from those of the class, increasing
> the risk that the actual distribution will be misallocated between attorney's fees
> and the plaintiffs' recovery. They potentially undermine the underlying purposes
> of class actions by providing defendants with a powerful means to enticing class
> counsel to settle lawsuits in a manner detrimental to the class.

*Int'l Precious Metals Corp. v. Waters*, 530 U.S. 1223 (2000). One district court was so disturbed by the combination of these two features it opined that "the presence of [both a reverter clause and a clear sailing clause] in any settlement agreement should present a presumption of *unfairness* that must be overcome by the proponents of the settlement." *Sylvester v. CIGNA Corp.*, 369 F. Supp. 2d 34, 46 (D. Me. 2005) (emphasis in original). In *International Precious Metals*, Justice O'Connor reluctantly denied certiorari in a challenge to an attorney fee award, noting that because the district court approved the order, petitioners waived any right to

challenge the reasonableness of the fee award.[18] 530 U.S. at 1223. The *Sylvester* court took this to mean that "the District Court must give particular scrutiny to reversionary fund agreements with clear sailing clauses at this stage", since "once a reversionary fund settlement with a clear sailing provision is approved, it may well be impossible for other courts to address any apparent unfairness in the misallocation of the total payout between attorneys' fees and actual payments to the class." *Sylvester,* 369 F. Supp. 2d at 46. Again, while the present case does not utilize a classic reversionary fund in which attorneys' fees are paid from a common pool that directly reduces the class's recovery, it undoubtedly did not escape either party's attention that every dollar not claimed from the fund was one dollar that BANA could use to pay class counsel's fees.

Although this court cannot know for certain how much the class gained (due to BANA's voluntary remediation) or lost (due to unconscious fee-seeking) as a result of class counsel's efforts, it has nonetheless been charged as a fiduciary for the class. In that role, this court finds that the terms of the settlement are neither fair nor adequate to the class members.

---

[18] In *International Precious Metals*, the reversionary fund was $40 million, of which $6.5 million was distributed, and $13 million in fees were awarded.

IT IS THEREFORE ORDERED THAT:

(1) The Motions for Approval (#99 and #101) are DENIED.

(2) Parties are ordered to further mediation with Judge David G. Bernthal.

ENTERED this 4th day of October, 2012

s/ Michael P. McCuskey

MICHAEL P. McCUSKEY
UNITED STATES DISTRICT JUDGE